T.C. Memo. 2002-121



UNITED STATES TAX COURT



ESTATE OF MORTON B. HARPER, DECEASED, MICHAEL A. HARPER,
EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 19336-98.          Filed May 15, 2002.



     HFLP, a limited partnership, was established in
1994 and was capitalized by the contribution thereto by
D of the majority of his assets.  D was initially named
as the sole limited partner and his children, M and L,
were designated as general partners.  D subsequently
gave to M and L 24- and 36-percent limited partnership
interests, respectively.  At his death in 1995, D
continued to hold a 39-percent limited partnership
interest in HFLP.

     <u>Held</u>:  The property contributed by D to HFLP is
includable in his gross estate pursuant to sec.
2036(a), I.R.C.

     <u>Held</u>, <u>further</u>, value of the assets to be included
in the gross estate determined.

Warren J. Kessler and Joan B. Kessler, for petitioner.

Donna F. Herbert and Jonathan H. Sloat, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined, as a primary position, a Federal estate tax deficiency in the amount of $331,171 with respect to the estate of Morton B. Harper (the estate).  In the alternative, respondent determined a Federal estate tax deficiency of $150,496 and a Federal gift tax deficiency of $180,675 for the 1994 calendar period.  The principal issue for decision is the proper treatment for estate and gift tax purposes of interests in a limited partnership, some of which were transferred by Morton B. Harper (decedent) prior to his death, and another of which was held by decedent at his death.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect during the relevant periods, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  Decedent was a resident of Palm Springs, California, when he died testate in Portland, Oregon, on February 1, 1995.  No probate proceeding was ever

filed by or on behalf of the estate. Decedent is survived by his two children, Michael A. Harper (Michael) and Lynn H. Factor (Lynn). Decedent's wife, Ruth Harper, died in 1988. Michael serves as executor of the estate and provided a mailing address in Lake Oswego, Oregon, at the time the petition in this case was filed.

Decedent was born on September 1, 1908, in Cincinnati, Ohio. He later attended law school, graduating in 1931, and began practicing law in Chicago. His practice initially specialized in corporate and "political" law and subsequently expanded to include bankruptcy, tax, real estate, and wills and trusts law. After World War II, decedent and his family moved to California where decedent continued his legal practice, focusing in particular on the entertainment industry. Decedent was a member of the California bar from 1946 until his death. Decedent was diagnosed with prostate cancer in 1983 and with cancer of the rectum in 1989.

On December 18, 1990, decedent created a revocable living trust entitled the Morton B. Harper Trust (the Trust). The trust instrument designated decedent as the original trustee and as the initial primary beneficiary. The document further provided: "During the lifetime of the Trustor, the Trustee, in Trustee's sole discretion may pay or apply the net income and/or corpus, or so much as Trustee chooses, to or for the benefit of the

Trustor". Michael and Lynn were named as successor trustees and were to receive the trust assets upon decedent's death, with 60 percent thereof being distributed to Lynn and 40 percent to Michael. The percentages were based on perceived need; Michael has pursued a successful career in business as a real estate professional, while Lynn has been less consistent in fiscal matters.

At all relevant times, Lynn maintained a residence in Hawaii. On December 18, 1990, a complaint was filed by the Association of Apartment Owners of International Colony Club (AOAO) against Lynn in the Circuit Court of the Second Circuit, State of Hawaii. Lynn owned a home within the International Colony Club condominium project, and the AOAO was the condominium association overseeing that project. The complaint alleged that Lynn had engaged in unauthorized and illegal construction and renovation of her property and requested both injunctive and monetary relief. Subsequently, in November of 1992, the AOAO demanded arbitration of its claims. An arbitration award was then entered against Lynn in December of 1993 and required extensive reconstruction work as well as payment of fees, costs, and expenses.

Lynn and Michael testified that following entry of the above award, Lynn told Michael about her litigation versus the AOAO and the concomitant award, which Michael then communicated to

decedent.  Thereafter, in approximately February of 1994, Michael and decedent met in California with John G. Coulter, Jr., an experienced real estate developer familiar with the Hawaii market.  Michael had previously contacted Mr. Coulter, asking him to review documents relating to the Hawaii lawsuit and to offer his advice.  After reviewing the documents and speaking to a gentleman involved in management of the condominium, Mr. Coulter expressed his concern that Lynn had gotten herself into "deep water"; that is, into a situation where "if she takes additional steps which could injure her further, her loss could go beyond the judgment".  He also recommended that they evaluate her legal counsel and suggested that "they get involved with her in the management of her assets through a trust or some other form of involvement."  Several weeks after the meeting, Michael accompanied Mr. Coulter to Hawaii for the purpose of being introduced to other potential representatives for Lynn.  On March 23, 1994, the attorney who had represented Lynn in the AOAO proceeding filed a complaint against her alleging unpaid legal fees in the amount of $18,153.92.

At a time not entirely clear from the record, decedent made the decision to form a limited partnership and to contribute thereto the majority of his assets.  An Agreement of Limited Partnership for Harper Financial Company, L.P. (HFLP), was prepared and sets forth the governing provisions for the entity.

The document begins with language stating that the Agreement was made "as of the 1st day of January, 1994", but later recites that the partnership shall commence its existence upon the date a certificate of limited partnership is duly filed with the California Secretary of State.  The primary purpose for HFLP's formation, according to the Agreement, was as follows:

> The acquisition, including by purchase of, sale of, management of, holding, investing in and reinvesting in stocks (both common and preferred), options with respect thereto, bonds, mutual funds, debt instruments, money market funds, notes and deeds of trust and similar instruments and investments (the "Portfolio").

Michael and Lynn were named as the general partners of HFLP and the Trust as the sole limited partner, with interests of .4 percent, .6 percent, and 99 percent, respectively.  Michael was also designated to serve as the managing general partner.  As regards his authority, the Agreement provides:

> Subject to the provisions of Paragraph 7.3, the Managing General Partner shall have the full, exclusive and complete authority and discretion in the management and control of the business of the Partnership for the purposes stated herein and shall have the right to make any and all decisions affecting the business of the Partnership.  Subject to the provisions of this Agreement, the Managing General Partner shall have full and exclusive authority with respect to the Portfolio, including rights of sale, reinvesting and voting. * * *

The referenced Paragraph 7.3 then specifies the following limitations:

> Notwithstanding the provisions of this Paragraph 7, neither General Partner shall have any right, power or authority to:

(a) Do any act in contravention of this Agreement, without first obtaining the written consent thereto of a "Majority in Interest of the Limited Partners" * * * [defined as limited partners holding more than 50 percent of the interest in the ordinary income of the partnership held by limited partners].

(b) Do any act * * * which would (i) make it impossible to carry on the ordinary business of the Partnership, or (ii) change the nature of the Partnership's business, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(c) Confess a judgment against the Partnership, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(d) Possess Partnership property, or assign the Partnership's right in such property, for other than a Partnership purpose without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(e) Admit a person as a limited partner, otherwise than as permitted by this Agreement, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(f) Elect to dissolve and wind up the Partnership, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(g) Sell or reinvest 5% or more of the Portfolio (based on their fair market value) in a single transaction or in a related series of transactions, other than in the ordinary course of business, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(h) Issue or sell new interests in the Partnership (or admit new partners in connection therewith) or permit the contribution of new capital to

the Partnership, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(i) Enter into any transactions, other than those transactions contemplated by Paragraph 7, in which a General Partner has an actual or potential conflict of interest with the Trust or the Partnership, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

(j) Admit a person as a general partner, without first obtaining the written consent thereto, and to any related transactions with such person, of a Majority in Interest of the Limited Partners.

(k) Amend this Agreement, without first obtaining the written consent thereto of a Majority in Interest of the Limited Partners.

In addition, Paragraph 12.5 provides explicitly that "The Trust is entitled to vote, prior to any such action being taken to" approve any of the above-enumerated actions.

Regarding capital accounts and contributions, the Agreement states that capital accounts were to be established and maintained in accordance with section 704(b) and the regulations promulgated pursuant thereto; namely, section 1.704-1(b)(2)(iv), Income Tax Regs. In general, Paragraph 10.2 of the document requires that profits and losses be allocated 0.6 percent, 0.4 percent, and 99 percent to the capital accounts of Lynn, Michael, and the Trust, respectively. The Agreement also sets forth the following with respect to contributions: "Concurrently with the execution of this Agreement (or as soon thereafter as is reasonably possible), the Trust shall make an initial capital

contribution to the Partnership consisting of the Portfolio.  The General Partners shall have no obligation to make any contribution to the capital of the Partnership."

Although "the Portfolio" is not defined in the Agreement, there appears to be no dispute between the parties that it consisted of:  (1) Securities held in a brokerage account at M.L. Stern & Co., Inc., (2) securities held in a Putnam Investments account, (3) securities held in two Franklin Fund accounts, (4) 2,500 shares of Rockefeller Center Properties, Inc., and (5) a $450,000 note receivable from Jack P. Marsh.  The parties value these assets at between $1.6 and $1.7 million (rounded), an amount representing approximately 94 percent of decedent's total assets.  The Trust's capital account in HFLP was credited with 99 percent of the value of the property contributed.  Decedent retained, personally or through the Trust, his personal effects, a checking account, an automobile, and his Palm Springs condominium.

As regards distributions, Paragraph 11.1 of the Agreement states:  "Subject to all of the provisions of this Agreement, funds of the Partnership from any source shall be distributed to the Partners at such times and in such amounts as are determined in the sole and absolute discretion of the Managing General Partner."  Paragraph 11.2 then goes on to recite:

> Funds of the Partnership shall be distributed as follows:

(a) First, to any Partner, the amount then due on any Advances [loans to the entity] * * *

(b) Ordinary Net Cash Flow [revenues from dividends, interest, and other items of ordinary income in excess of ordinary and necessary operating expenses] shall be distributed 0.6% to Lynn, 0.4% to Michael and 99% to the Trust.

(c) Extraordinary Net Cash Flow [revenues from capital gains in excess of capital losses, less consequent expenses] shall be distributed to the Partners with positive Capital Account balances, pro rata to the extent thereof.

The Agreement also specifies that "No distribution of funds of the Partnership shall be made until the allocations described in Paragraph 10 hereof [regarding the allocation of profits and losses to the partners' capital accounts] have first been made."

The Agreement prohibits transfer, sale, assignment, or encumbrance of a limited partnership interest without the consent of all partners. Any transfer attempted in violation of this restriction is declared by the Agreement to be null and void ab initio. Under provisions of the Agreement, the entity is to be dissolved upon the earlier of: (1) January 1, 2034; (2) the retirement, withdrawal, death, or insanity of any general partner or any other event or condition, other than removal, which results in a general partner's ceasing to be a general partner, unless (i) at the time there is at least one remaining general partner to continue the business of the partnership and such remaining general partner chooses to do so, or (ii) all partners agree in writing within 60 days thereof to continue the business

and, if necessary, to the admission of one or more general partners; (3) an election to dissolve the partnership made in writing by the general partners and the limited partners; or (4) the failure to elect a successor general partner within 60 days after the removal of the last general partner.

Although the Agreement contains no express provision regarding the removal of a general partner, it specifies that rights and duties of the partners are governed by the California Revised Limited Partnership Act except to the extent the Agreement states otherwise. This Act includes the following: "The limited partners shall have the right to vote on the removal of a general partner, and that action shall be effective without further action upon the vote or written consent of a majority in interest of all partners". Cal. Corp. Code sec. 15636(f)(2) (West 1991).

The Agreement was signed by decedent on behalf of the Trust, by Michael, and by Lynn. Although the signatures are undated, the document was executed by Michael in May or June of 1994. Lynn could not remember when she signed the Agreement and did not read it prior to signing. A certificate of limited partnership was filed on behalf of HFLP with the California Secretary of State on June 14, 1994.

From June 17 to June 20, 1994, decedent was hospitalized in Palm Springs.  Medical records prepared at that time contain the explanation set forth below:

> This is one of multiple Desert Hospital admissions for this 85-year-old Caucasian who is well known to have metastatic colonic carcinoma and prostatic carcinoma and admitted at the present time for poor oral intake, poor fluid intake, dehydration and for further rehydration, close observation, nutrition support, etc.

After his release, decedent went to Oregon, where he resided until his death.  He first stayed with Michael for approximately a month and then moved into a nearby Oregon retirement facility known as Carmen Oaks.  Carmen Oaks served independent individuals and was not a nursing center.

Thereafter, by a document entitled Assignment of Partnership Interest and Amendment No. 1 to Agreement of Limited Partnership for Harper Financial Company, L.P., dated and made effective as of July 1, 1994, the Trust transferred to Michael and Lynn 60 percent of the Trust's partnership interest.  As a result, Michael and Lynn became holders of 24- and 36-percent limited partnership interests, respectively, and were given corresponding percentages of the Trust's capital account balance.  The limited partnership interests held by Michael and Lynn were designated as "Class B Limited Partnership Interest[s]" and were entitled to 60 percent of the income and loss of the entity, with 40 percent thereof going to Michael and 60 percent to Lynn.

The Amendment also reclassified the Trust's remaining 39-percent limited partnership interest as a "Class A Limited Partnership Interest" which was entitled to 39 percent of the entity's income and losses and to a "Guaranteed Payment" of "4.25% annually of its Capital Account balance on the Effective Date, payable quarterly no later than twenty (20) days after the close of any such calendar quarter (or sooner, if cash flow permits)." Decedent, as trustee of the Trust, Michael, and Lynn signed the document.

On July 26, 1994, decedent commenced the process of transferring the Trust's portfolio to the partnership, which process continued for approximately the next 4 months. On July 26, 1994, decedent executed as trustee an allonge endorsement assigning to HFLP the Trust's interest in the Marsh note. A collateral assignment of the Trust's interest in property securing the note was also signed on that date. Then, on August 28, 1994, a letter agreement confirming and/or finalizing the transfer was executed by or on behalf of Mr. Marsh, the Trust, and HFLP.

Next, a letter dated September 29, 1994, was sent by decedent to M.L. Stern & Co. confirming instructions for (1) the sale of all securities held in the Trust's account and (2) the use of the proceeds for the immediate repurchase of the same securities for an account established on behalf of the

partnership. Michael, as managing general partner, completed the requisite form opening a new account with M.L. Stern & Co. for the partnership. The form designated Michael as the "individual * * * authorized to enter orders on behalf of customer". Neil Hattem served as decedent's broker and subsequently as the broker on the HFLP account.

Letters dated September 30, 1994, were then sent by decedent to Putnam Investor Services and to Franklin Templeton requesting transfer of the respective Putnam and Franklin Fund accounts to HFLP. Lastly, by a letter dated November 22, 1994, decedent requested transfer of the Trust's stock in Rockefeller Center Properties to the partnership.

During this period, on September 23, 1994, Michael opened a checking account at Bank of America in the name of the partnership with a $200 deposit. Thereafter, the first activity in the account, other than the debiting of a monthly service charge, was a deposit on October 13, 1994, of $3,750 representing interest paid on the Marsh note. The check register maintained by Michael, in conjunction with his explanatory testimony, reflects checks written for the benefit of HFLP partners in 1994 and 1995, as follows:

| Date | Lynn | Michael | Trust | Description and/or Purpose |
|------|------|---------|-------|---------------------------|
| 11/9/94 | $120 | | | reimbursement of contribution to checking account opening deposit |
| 11/9/94 | | $80 | | reimbursement of contribution to checking account opening deposit |
| 11/9/94 | 4,200 | | | distribution |
| 11/9/94 | | 2,800 | | distribution |
| 11/9/94 | | | $3,800 | distribution |
| 12/19/94 | 2,250 | | | distribution |
| 12/19/94 | | 1,500 | | distribution |
| 12/19/94 | | | 3,750 | distribution |
| 1/10/95 | 2,250 | | | distribution |
| 1/10/95 | | 1,500 | | distribution |
| 1/10/95 | | | 3,750 | distribution |
| 1/17/95 | | | 6,520 | "additional distribution" to cover tax voucher |
| 1/30/95 | | | 4,000 | "additional distribution" to complete gift |
| 5/30/95 | | | 5,000 | "return of capital" for an estate expense |
| 8/30/95 | | | 5,000 | "return of capital" for an estate purpose |
| 10/13/95 | | | 5,000 | "capital return" for an estate expense |
| 10/30/95 | | | 195,000 | "return of capital" to cover estate taxes |
| 11/15/95 | 7,200 | | | distribution |
| 11/15/95 | | 4,800 | | distribution |

The funds to make the $195,000 payment on October 30, 1995, were obtained through two deposit transactions. Proceeds in the amount of $135,000 from the liquidation of a money market account with M.L. Stern & Co. and in the amount of $60,000 from a reduction in principal on the Marsh note were placed into the bank account on October 30, 1995. Michael negotiated the $60,000 payment on the Marsh note in return for agreeing to extend the maturity date of the remaining principal balance.

Prior to establishment of the partnership account, amounts received with respect to securities contributed to HFLP were deposited in the Morton B. Harper Trust checking account.

In January of 1995, decedent entered hospice care in Oregon. Preceding that time, he had been hospitalized on three occasions, in late September, early October, and late November. He had also renewed his vehicle registration on September 23, 1994, and his driver's license was current at the time of his death. Decedent passed away on February 1, 1995.

Thereafter, in March or April of 1995, Michael engaged a certified public accountant, David S. Blankstein, to prepare financial books and tax returns for the partnership and also to prepare the income, gift, and estate tax returns due with respect to decedent. In furtherance of these objectives, Mr. Blankstein reviewed the partnership Agreement; the certificate of limited partnership; the Amendment; checking account records for the

partnership, the Trust, and decedent; M.L. Stern & Co. statements for the partnership and the Trust; Putnam Investments statements for the partnership and the Trust; Franklin Funds statements for the partnership and the Trust; the Rockefeller Center Properties stock certificate; and the Marsh note.

Mr. Blankstein set up a general ledger for HFLP to categorize and account for all transactions affecting partnership assets and income beginning June 14, 1994.  Capital accounts were established for each partner, as well as ledger accounts to show distributions to partners, income received by the partnership on the various portfolio assets, proceeds from the sale of securities, and costs and charges incurred.  In addition, an account labeled "Receivable from Trust" was created primarily to reflect amounts received by the Trust after June 14, 1994, that should properly have been received by the partnership.  This account was presumably necessitated in large part by the delay in transferring title to the portfolio securities and in opening the partnership bank account.  The balance in this account was then treated as a distribution to the Trust; no funds were actually transmitted between the two entities.  Mr. Blankstein also conceded that several items which should have been attributed to the partnership were omitted.

A Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, and a Form 706, United States Estate (and

Generation-Skipping Transfer) Tax Return, were filed on behalf of decedent and were received by the Internal Revenue Service on October 16, 1995, and November 2, 1995, respectively.  The gift tax return reported the .4-percent general and 24-percent limited partnership interests given to Michael and the .6-percent general and 36-percent limited partnership interests given to Lynn.  The estate tax return included as part of decedent's gross estate the Trust's 39-percent limited partnership interest in HFLP.

Notices of deficiency were issued with respect to the above returns on October 21, 1998.  As previously stated, respondent therein advanced a primary and an alternative position.  Under the primary position, the full value of the assets held by HFLP was included in decedent's gross estate, and prior taxable gifts were reduced to $0, resulting in an estate tax deficiency of $331,171 and no deficiency in gift tax.  Under the alternative position, respondent determined an estate tax deficiency of $150,496 and a gift tax deficiency of $180,675.

OPINION

## I.  Contentions of the Parties

The parties in this case disagree regarding how properly to treat the partnership interests transferred by decedent to his children during life and the interest included through the Trust in his estate at death.  Respondent contends that the full fair market value of the assets contributed to HFLP is includable in

decedent's gross estate upon either of two alternative theories. Respondent argues that the partnership lacked economic substance and should thus be disregarded for transfer tax purposes or, alternatively, that section 2036(a) applies to include the value of the contributed property in decedent's gross estate due to decedent's retention of the economic benefit of the assets.

Furthermore, respondent maintains that even if the partnership is respected and section 2036(a) is found not to apply, the discounts claimed by the estate with respect to valuation of the subject partnership interests are excessive, unsupported, and should not be sustained. Respondent offers and relies upon the expert reports of John A. Thomson in connection with this latter argument.

Conversely, the estate emphasizes that HFLP was a duly organized and operating limited partnership established with the business purpose of protecting from Lynn's creditors the assets that Lynn would receive or inherit from decedent. Hence, according to the estate, the partnership must be recognized for tax purposes. Moreover, it is the estate's position that section 2036(a) has no application here because the Trust unconditionally transferred the portfolio assets to HFLP, the Trust received adequate and full consideration for the transfer in the form of a credit to its capital account, and there existed no express or implied agreement that decedent would retain a right to control

over or income generated by the contributed property.  The estate thus contends that this controversy devolves to a valuation case where the property to be valued takes the form of partnership interests in HFLP and where the analysis provided by the estate's expert Clint Cronkite establishes a sound appraisal thereof.

II.  Evidentiary Issues

As a preliminary matter, we address several evidentiary objections reserved by the parties in the stipulation of facts. The estate objected to the admission of Exhibit 27-J on grounds of authenticity, relevance, and prejudice.  Exhibit 27-J is a facsimile of medical records for decedent requested by and sent to the Internal Revenue Service.  The estate pointed out at trial that the lines within the document for the doctor's signature are blank.  During the proceeding, respondent offered as Exhibit 53-R signed copies of key portions of the records.  The estate agreed that no objection would be pressed as to the authenticity of Exhibit 53-R, at which time the document was admitted into evidence with the estate renewing objections as to relevance and prejudice.  Given this posture, Exhibit 27-J is largely cumulative, and we sustain the estate's objection thereto.  We also overrule any remaining objections to Exhibit 53-R.

The estate similarly objected to Exhibit 28-J on grounds of authenticity, relevance, and prejudice.  This document is a letter to the Internal Revenue Service from one of decedent's

physicians, and the estate again cites concerns with the signature thereon.  In light of these concerns and the fact that the letter does not appreciably add to the information reported in the admitted medical records, we sustain the estate's objection.

The estate's final objection in the stipulation was to the admission of Exhibit 29-J, a letter to Michael from decedent's doctor, on grounds of relevance and prejudice.  These objections, however, were overruled at trial, and the document was taken into evidence.

Respondent in the stipulation objected to the admission of Exhibits 33-J through 37-J, which pertain to the Hawaii arbitration, on the ground of relevance.  On reply brief, respondent expressly waived objection to these documents. Exhibits 33-J through 37-J are admitted into evidence.

Respondent also in the stipulation raised relevancy objections to Exhibits 41-J, 44-J, and 45-J.  Since these documents (a photo of decedent taken in the 1950s and copies of various checks written for gifts and charitable contributions) all relate to periods prior to those at issue and do not bear in any meaningful way on matters considered herein, we sustain respondent's objections.

III.  Inclusion in the Gross Estate--Section 2036

A.  General Rules

As a general rule, section 2501 imposes a tax for each calendar year "on the transfer of property by gift" by any taxpayer, and section 2511(a) further clarifies that such tax "shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible".  For purposes of determining whether a gift has been made, section 2512(b) provides:  "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift".  The tax is then computed based upon the statutorily defined "taxable gifts", which term is explicated in section 2503.  Section 2503(a) states generally that taxable gifts means the total amount of gifts made during the calendar year, less specified deductions.

Similarly, the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Sec. 2001(a).  Such taxable estate, in turn, is defined as "the value of the gross estate", less applicable deductions.  Sec. 2051.  Section 2031(a)

specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045.

Section 2033 broadly states that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets. Among these specific sections is section 2036, which reads in pertinent part as follows:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Regulations likewise explain that the gross estate under section 2036 includes the value of transferred property if the decedent

retained the "use, possession, right to the income, or other enjoyment of the transferred property".  Sec. 20.2036-1(a)(i), Estate Tax Regs.

Given the language used in the above-quoted provisions, it has long been recognized that "The general purpose of this section is 'to include in a decedent's gross estate transfers that are essentially testamentary' in nature."  Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)). Accordingly, courts have emphasized that the statute "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death."  Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

As used in section 2036(a)(1), the term "enjoyment" has been described as "synonymous with substantial present economic benefit."  Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); see also Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).  Moreover, possession or enjoyment of transferred property is retained for purposes of section 2036(a)(1) where there is an express or implied understanding to that effect among the parties at the time of the transfer, even if the retained interest is not

legally enforceable.  Estate of Maxwell v. Commissioner, 3 F.3d 591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Guynn v. United States, supra at 1150; Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979).  Regulations likewise provide that "An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred."  Sec. 20.2036-1(a), Estate Tax Regs.

The existence or nonexistence of such an understanding is determined from all of the facts and circumstances surrounding both the transfer itself and the subsequent use of the property. Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, supra at 86.  However, an exception to the treatment mandated by section 2036(a) exists where the facts establish "a bona fide sale for an adequate and full consideration in money or money's worth".

B.  Burden of Proof

Typically, the burden of disproving the existence of an agreement regarding retained enjoyment has rested on the estate, and this burden has often been characterized as particularly onerous in intrafamily situations.  Estate of Maxwell v. Commissioner, supra at 594; Estate of Reichardt v. Commissioner, supra at 151-152; Estate of Rapelje v. Commissioner, supra at 86.

With respect to the case at bar, however, respondent conceded on reply brief that the opposite burden applies here. The estate had asserted on opening brief that the burden of proof regarding nonvaluation issues shifted to respondent, to which contention respondent replied as follows:

> The respondent agrees that the lack of economic substance and I.R.C. § 2036 issues are new matters within the meaning of Tax Court Rule 142(a). As such, the petitioner correctly states that the respondent bears the burden of proof on these issues under Shea v. Commissioner, 112 T.C. 183 (1999). * * * [Fn. ref. omitted.]

For purposes of this litigation, we have accepted respondent's concession and have considered its role in our analysis. Nonetheless, after reviewing all of the evidence presented, we have found that our resolution does not depend on which party bears the burden of proof. Both parties adduced testimony and offered exhibits in support of their respective positions, and the evidence so introduced was not evenly balanced in favor of the competing alternatives. Accordingly, we have based our conclusions upon the preponderance of the evidence rather than upon an allocation of the burden of proof.

### C. Existence of a Retained Interest

As previously indicated, section 2036 mandates inclusion in the gross estate of transferred property with respect to which the decedent retained, by express or implied agreement, possession, control, enjoyment, or the right to income. The

focus here is on whether there existed an implicit agreement that decedent would retain control or enjoyment, i.e., economic benefit, of the assets he transferred to HFLP.

Respondent avers that section 2036's applicability is established on these facts, emphasizing in particular actual conduct with respect to partnership funds. Respondent further maintains that this case is indistinguishable from the situations presented in Estate of Reichardt v. Commissioner, supra, and Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242. The estate, on the other hand, discounts the evidence and cases relied on by respondent, emphasizing instead the formal terms of the partnership arrangement and the accounting treatment of entity assets.

In Estate of Reichardt v. Commissioner, supra at 147-148, the decedent formed a family limited partnership, the general partner of which was a revocable trust created on the same date. The decedent and his two children were named as cotrustees, but only the decedent performed any meaningful functions as trustee. Id. at 147, 152. He was the only trustee to sign the articles of limited partnership, to open brokerage accounts, or to sign partnership checks. Id. at 152. He transferred his residence and all of his other property (except for his car, personal effects, and a small amount of cash in his checking account) to the partnership and subsequently gave his two children limited

- 28 -

partnership interests.  Id. at 148-149, 152-153.  The decedent deposited partnership income in his personal account, used the partnership checking account as his personal account, and lived at his residence without paying rent to the partnership.  Id. at 152.  Based on these facts, we concluded that nothing but legal title changed in the decedent's relationship to his assets after he transferred them to the partnership.  Id. at 152-153.

In Estate of Schauerhamer v. Commissioner, supra, the decedent formed three limited partnerships.  The decedent and one of her three children were named as the general partners of each partnership, with the decedent's being designated as the managing partner.  Id.  The decedent transferred business assets, including real estate, partnership interests, and notes receivable, to the partnerships in undivided one-third shares.  Id.  Limited partnership interests in these entities were given to family members.  Id.  Partnership bank accounts were opened, but the decedent deposited the income earned by the partnerships into the account she used as her personal checking account, where it was commingled with funds from other sources.  Id.  Checks were then written from this account to pay both personal and partnership expenses.  Id.  The decedent's children later acknowledged at trial that formation of the partnerships was merely a way to enable the decedent to assign interests in the partnership assets to family members, with the assets to be

managed by the decedent exactly as in the past. Id.  We therefore found the assets includable under section 2036(a).  Id.

We agree with respondent that the circumstances before us bear many similarities to those in Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000), and Estate of Schauerhamer v. Commissioner, supra, and are convinced that a like result should obtain.  We focus particularly on the commingling of funds, the history of disproportionate distributions, and the testamentary characteristics of the arrangement in support of our conclusion that there existed an implied agreement that decedent would retain the economic benefit of the assets transferred to HFLP.

As regards commingling of funds, we note that this fact was one of the most heavily relied upon in both Estate of Reichardt v. Commissioner, supra at 152, and Estate of Schauerhamer v. Commissioner, supra.  We find the disregard here for partnership form to be equally egregious.  The Agreement specified:  "All funds of the Partnership shall be deposited in a separate bank account or accounts".  Yet no such account was even opened for HFLP until September 23, 1994, more than 3 months after the entity began its legal existence.  Prior to that time, partnership income was deposited in the Trust's account, resulting in an unavoidable commingling of funds.

Michael testified concerning this delay as follows:

Inadvertently, either my account or I failed to apply timely for any--an employee [sic] identification

number. That is required before a checking account is open. So I just made the determination that without a checking account and I wanted the flow of cash, what we would do is use the Morton B. Harper Trust account as a holding account, and then I instructed the accountant to properly credit and account for those funds. * * *

This explanation, however, seems to beg the question. Had Michael sought promptly upon HFLP's creation to establish a bank account, he would have been immediately alerted to the need for an EIN. Hence, he either neglected to attempt opening and/or using an account or allowed the lack of an EIN to continue for several months after having been reminded of its necessity. Both reflect at best a less than orderly approach to the formal partnership structure so pressed by the estate.

Moreover, we find Michael's reliance on post mortem accounting manipulations to be especially unavailing. Michael and Mr. Blankstein, HFLP's accountant, each testified that no moneys actually changed hands in connection with the adjustments. In response to similar contentions in Estate of Reichardt v. Commissioner, supra at 154-155, we stated:

The 1993 yearend and 1994 post mortem adjusting entries made by Hannah's firm were a belated attempt to undo decedent's commingling of partnership and personal accounts. There is no evidence that the partnership or decedent transferred any funds to the other as a result of the adjusting entries. After-the-fact paperwork by decedent's C.P.A. does not refute that decedent and his children had agreed that decedent could continue to use and control the property during his life. [Fn. ref. omitted.]

Here Michael did not even hire Mr. Blankstein until after decedent's death, strengthening the inference that the partners had little concern for establishing any precise demarcation between partnership and other funds during decedent's life.

Closely related to the delay in opening the partnership bank account and consequent commingling of income is the delay in formally transferring the underlying portfolio assets to HFLP. No attempt was made to begin the process of title transfer until July 26, 1994, when decedent executed an allonge endorsement assigning the Marsh note to HFLP. No action was taken with respect to any of the other securities until September 29 and 30, 1994, when letters addressing transfer of the M.L. Stern & Co., Putnam, and Franklin accounts were drafted and an account with M.L. Stern & Co. was opened on behalf of HFLP. A letter requesting transfer of the Rockefeller Center Properties stock was not prepared until November 22, 1994.

When Michael was asked on cross-examination to explain this delay between the effective date of the partnership and the formal transfer of assets into the entity, he replied: "Probably for different reasons, some mechanical delays and who we're dealing with, but generally, there was no rush to do it. We were just doing it in an orderly fashion." Next, in response to a further question asking why there was no rush, he continued: "There was no rush. I mean, we were just handling the business

in an orderly fashion.  There wasn't any deadline or urgency to do it and get it done."  The following colloquy then ensued:

> Q    Now let's talk for a moment about the income from the portfolio assets.  Before the title to the assets was transferred to the partnership, your father or his trust continued to receive the income from those assets.  Isn't that right?
>
> A    Would you restate that?  I'm lost.
>
> Q    Okay.  At a certain point in time the assets were contributed to the partnership, correct?
>
> A    Yes.
>
> Q    Okay.  Before that happened, your father's trust continued to receive the income from those assets, correct?
>
> A    Probably.
>
> Q    Well, why isn't it Yes?
>
> A    Well, before he contributed it, he was in control of that.  Who else would get it?  I say probably.

Hence, we are again met with an example of indifference by those involved toward the formal structure of the partnership arrangement and, as a corollary, toward the degree of separation that the Agreement facially purports to establish.  Moreover, until title to the assets was transferred to HFLP, decedent would not have forfeited the control over the underlying securities that he through the Trust possessed as legal holder.  Thus, at the time of the June 14, 1994, creation of HFLP and for some months following, decedent's Trust retained title to the underlying assets and was issued the dividends and interest

generated thereby. In addition, according to Michael's own testimony, the partners were in no hurry to alter this state of affairs. This speaks volumes concerning how little the partners understood to have changed in decedent's relationship to his assets as a result of the entity's formation.

Turning to facts regarding distribution of partnership funds, we find equally compelling indicia of an implied understanding or agreement that the partnership arrangement would not curtail decedent's ability to enjoy the economic benefit of assets contributed to HFLP. In addition to the deemed distributions engendered by the commingling discussed above, even the distributions made by Michael from the partnership checking account are heavily weighted in favor of decedent. The check register indicates that during the period extending from September of 1994 through early November 1995, partnership funds were distributed for the benefit of Michael and Lynn in the amounts of $5,800 and $8,700, respectively. These distributions occurred on November 9, 1994, December 19, 1994, and January 10, 1995. During that same time frame, partnership checks totaling $231,820, were remitted to the Trust, with the last being written on October 30, 1995. Only then did distributions to Michael and Lynn resume with checks drawn on November 15, 1995, in the amounts of $4,800 and $7,200, respectively. Given this pattern, we would be hard pressed to conclude other than that the

partnership arrangement did little to curtail the access of decedent or his estate to the economic benefit of the contributed property.

Similarly significant is the evidence that certain of the distributions to the Trust were linked to a contemporaneous expense of decedent personally or of his estate. These amounts, variously labeled by Michael "additional distribution", "return of capital", or "capital return", totaled $220,520 and even included $4,000 to enable decedent to complete a gift 2 days before he died. This evidence buttresses the inference that decedent and his estate had ready access to partnership cash when needed.

On the issue of distributions, the estate repeatedly intones, in mantralike fashion: "The managing general partner's right to make distributions was unlimited and could be made 'at such times and in such amounts as are determined in the sole and absolute discretion of the Managing General Partner.'" Once again, however, this point begs the question. The more salient feature is not that Michael did or did not have authority to make the distributions but that he frequently used his position to place partnership funds at the Trust's disposal in response to personal or estate needs. No other partner was afforded the same luxury of "additional" distributions or capital returns.

Furthermore, the fact that the contemporaneous check register labels various disbursements to the Trust a "return of capital", regardless of whether such are proper under the Agreement and/or should be otherwise classified, also supports the clear implication that Michael understood decedent's capital could and would be made available to him if necessary. Additionally, Michael even liquidated an M.L. Stern & Co. money market account and renegotiated the Marsh note in order to obtain the requisite cash to enable the Trust to pay decedent's estate taxes. These facets, in turn, provide strong evidence of an implied agreement under which decedent did not divest himself economically of the contributed assets.

The estate also argues that the distributions to the Trust were consistent with the guaranteed payment obligation. Nonetheless, without regard once again to the veracity of this allegation, we find it of little import in our analysis. The record supports a conclusion that in making the payments Michael was motivated by concern not with meeting HFLP's guaranteed payment obligation but rather with facilitating underlying partner expenditures. Michael testified as follows on this subject:

> Q    Did you regularly pay the guaranteed payments to your father during 1994?
>
> A    Payments were made, yes.
>
> Q    Were they made regularly?

A     I don't know what you mean by "regularly."

Q     Were they made as provided for in the partnership agreement?

A     To the best of my ability, yes.

Q     Were you aware that the partnership agreement called for them to be paid quarterly?

A     Not specifically, no.

Q     You recall how often you made guaranteed payments to him?

A     I took the approach that I would look at receivables, and distributions were entirely within my control, and if the dollars were sitting there, I would possibly make distributions.  It could have been as often as monthly; I don't recall, as I sit here.

Q     How did you compute the amount of the guaranteed payments?

A     I don't understand.  What do you mean, how did I compute it?

Q     How did--how did you compute the amounts that you paid?  Did you compute them?  I mean, they were 4.25 percent of the portfolio, right?

A     Oh, I don't know if I did it--

Q     Of the capital--I'm sorry; I stand corrected.  The capital account.  They were supposed to be 4.25 percent of the capital account.

A     That's my--that's my understanding, yes.

Q     Did you make computations when you made those guaranteed payments?

A     It seems to me I did, yes.

Q     Did you do them in writing?

A     Well, I did them, and then I asked the accountant to double-check me on all of them--

Q    When?

A    --because I'm not an accountant.

Q    When did you ask him to double-check you on that?

A    Regularly.

The foregoing exchange solidifies our belief that moneys were not remitted to the Trust in a calculated effort to comply with the 4.25-percent entitlement.  The vague nature of the testimony makes clear that the guaranteed payment averments are nothing more than an attempted after-the-fact justification for Michael's actions.

In addition, given that Mr. Blankstein was not engaged until March or April of 1995, after decedent's death, his help was unavailable to Michael for purposes of any of the 1994 or early 1995 distributions, a circumstance which apparently did not deter Michael from proceeding despite his admitted lack of accounting expertise.  There are also questions with regard to whether profit and loss allocations called for by the Agreement should have been made prior to any distribution of funds.  In any event, we are satisfied that respect for the Agreement was not the catalyst for the disproportionate distributions made to the Trust.

We are equally unimpressed by the estate's references to the fiduciary capacity in which Michael purportedly acted as managing general partner.  The estate claims:  "Michael, as the managing

general partner, is a fiduciary and must act on behalf of the Partnership and all of its partners and cannot favor any one of them over any other of them.  He cannot make distributions to one partner without making distributions to all partners and did not do so."  The record, on the other hand, shows a consistent pattern of acting in response to particular needs of decedent or his estate.  We simply are unable to agree that Michael was acting in these instances first and foremost for the good of HFLP and not primarily as the son of his father.

Lastly, we focus on testamentary characteristics of the partnership arrangement.  According to the estate:

> It is clear from the record that the organization of the Partnership and the contribution by the Trust of the Portfolio to the Partnership's capital was not "testamentary."  No part of such transaction was intended to be effective at the time of Morton's death. The terms and conditions of the Partnership Agreement and the funding of the Portfolio were complete and unconditional and changed the relationship of the parties to the Portfolio assets. * * *

While we acknowledge that HFLP did come into existence prior to decedent's death and that some change ensued in the formal relationship of those involved to the assets, we are satisfied that any practical effect during decedent's life was minimal. Rather, the partnership served primarily as an alternate vehicle through which decedent would provide for his children at his death.

As previously discussed, decedent continued to be the principal economic beneficiary of the contributed property after HFLP's creation. The few minor distributions made to Michael and Lynn, which tellingly ceased throughout the entire period that funds were being disbursed for final gifts and estate expenses, hardly evidence a meaningful economic stake in the assets during decedent's life. Michael's technical control over management and distributions is likewise of little import. Although there was testimony that Michael reinvested proceeds of maturing bonds, and he presumably collected interest and dividends paid on securities held in HFLP's name, these activities are more akin to passively administrating than to actively managing the contributed portfolio. From the documents in the record, it appears that the composition of the portfolio changed little prior to decedent's death. We also note that a significant percentage of the portfolio consisted of professionally managed bond funds.

Given the above, we place little weight on averments concerning change, during decedent's life, in the partners' relationships to the contributed property. In addition, we believe that our conclusions in this regard are corroborated by the alleged reason advanced at trial and on brief for establishment of the partnership. The estate contends:

Morton's primary reason for transferring the Portfolio to the Partnership was to create an arrangement that would protect from Lynn's creditors, the assets that Lynn would receive or inherit from Morton. * * *

* * * * * * *

Once Morton learned of the [arbitration] award and its seriousness, he knew that he needed to address his concerns about Lynn's handling of her finances in a different manner than that provided in the Trust. Pursuant to Article V of the Trust agreement, on Morton's death, Lynn' [sic] share would be distributed to her outright. Following such distribution, Lynn would have the responsibility to manage her assets and Lynn's creditors could reach them without restriction or limitation. This was unacceptable to Morton.

* * * * * * *

Therefore, by placing Michael in charge of the Partnership and providing by gift and on Morton's death that all but a fraction of Lynn's interest would be held as a limited partner, Morton addressed his concerns about Lynn. Lynn's creditors would be inhibited due to the legal limitations of collecting a judgment from a limited partner's interest. [Citations omitted.]

The emphasis of this discussion is patently post mortem as opposed to inter vivos. Hence, not only the objective evidence concerning HFLP's history but also the subjective motivation underlying the entity's creation support an inference that the arrangement was primarily testamentary in nature. The objective record belies any significant predeath change, particularly from the standpoint of economic benefit, in the partners' relationship to the assets. Likewise, the subjective impetus prompting

decedent to form HFLP centered on what would happen to his property after death.  He wanted to protect what Lynn would receive from him, not what she currently possessed.

Other facets of the entity's establishment are similarly consistent with a testamentary arrangement.  In particular, the largely unilateral nature of the formation, the extent and type of the assets contributed thereto, and decedent's personal situation are indicative.  Michael testified that decedent made all decisions regarding the creation and structure of the partnership.  During cross-examination he stated:  "We really didn't discuss anything.  He told me what he wanted to do and he explained why, and I accepted the assignment."  Later, when asked why the guaranteed payment clause was added to the HFLP Agreement, Michael replied:  "The same reason every provision was put in the agreement. * * * Specifically, because that's what he wanted."  Such statements are far more consistent with a description of one man's estate plan than with any sort of arm's-length transaction or joint enterprise between partners.

The fact that the contributed property constituted the majority of decedent's assets, including nearly all of his investments, is also not at odds with what one would expect to be the prime concern of an estate plan.  We additionally take note of decedent's advanced age, serious health conditions, and experience as an attorney.

In summary, we are satisfied that HFLP was created principally as an alternate testamentary vehicle to the Trust. Taking this feature in light of all that is discussed above, we conclude that decedent retained enjoyment of the contributed property within the meaning of section 2036(a).

### D. Existence of Consideration

Having decided that decedent retained enjoyment of the transferred assets for purposes of section 2036(a), we turn to the question whether the statute's application may nonetheless be avoided on the basis of the parenthetical exception for "a bona fide sale for an adequate and full consideration in money or money's worth". The estate contends:

> The primary reason why I.R.C. §2036 does not apply to Petitioner is that the Trust's transfer of the Portfolio to the Partnership in exchange for a credit to its capital account for 99% of the fair market value of the Portfolio assets and a 99% interest in profits and losses is a "bona fide sale for an adequate and full consideration in money or money's worth." * * *

We, however, disagree on the ground that the estate's position fails to take into account significant aspects of the jurisprudence addressing this exclusionary language. The phrase, as used in a predecessor statute, was explained in early caselaw of this Court, as follows:

> Accordingly, the exemption from tax is limited to those transfers of property where the transferor or donor has received benefit in full consideration in a genuine arm's length transaction; and the exemption is not to be allowed in a case where there is only contractual

consideration but not "adequate and full consideration in money or money's worth." * * * [Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).]

It has similarly been stated in construing the "bona fide sale" terminology: "The word 'sale' means an exchange resulting from a bargain". Mollenberg's Estate v. Commissioner, 173 F.2d 698, 701 (2d Cir. 1949). The foregoing interpretations have subsequently been cited with approval in related contexts by both this and other Federal courts. See, e.g., Bank of N.Y. v. United States, 526 F.2d 1012, 1016-1017 & n.6 (3d Cir. 1975) (noting that "the statutory basis for requiring an arm's length bargain would seem to be the requirement of a 'bona fide' contract"); Estate of Morse v. Commissioner, 69 T.C. 408, 418 (1977) (observing that judicial decisions refer to a bona fide contract "as an arm's-length transaction or a bargained-for exchange"), affd. 625 F.2d 133 (6th Cir. 1980); Estate of Musgrove v. United States, 33 Fed. Cl. 657, 663-664 (1995). From the above language it can be inferred that applicability of the exception rests on two requirements: (1) A bona fide sale, meaning an arm's-length transaction, and (2) adequate and full consideration.

On the facts before us, HFLP's formation at a minimum falls short of meeting the bona fide sale requirement. Decedent, independently of any other anticipated interest-holder, determined how HFLP was to be structured and operated, decided

what property would be contributed to capitalize the entity, and declared what interest the Trust would receive therein. He essentially stood on both sides of the transaction and conducted the partnership's formation in absence of any bargaining or negotiating whatsoever. It would be an oxymoron to say that one can engage in an arm's-length transaction with oneself, and we simply are unable to find any other independent party involved in the creation of HFLP.

Furthermore, lack of a bona fide sale aside, we believe that to call what occurred here a transfer for consideration within the meaning of section 2036(a), much less a transfer for an adequate and full consideration, would stretch the exception far beyond its intended scope. In actuality, all decedent did was to change the form in which he held his beneficial interest in the contributed property. We see little practical difference in whether the Trust held the property directly or as a 99-percent partner (and entitled to a commensurate 99-percent share of profits) in a partnership holding the property. Essentially, the value of the partnership interest the Trust received derived solely from the assets the Trust had just contributed. Without any change whatsoever in the underlying pool of assets or prospect for profit, as, for example, where others make contributions of property or services in the interest of true joint ownership or enterprise, there exists nothing but a

circuitous "recycling" of value. We are satisfied that such instances of pure recycling do not rise to the level of a payment of consideration. To hold otherwise would open section 2036 to a myriad of abuses engendered by unilateral paper transformations.

We note that the foregoing interpretation is supported by our holdings in both Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000), and, by implication, Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242. In Estate of Reichardt v. Commissioner, supra at 155-156, the taxpayer contended that the parenthetical exception should apply. We, however, rejected this argument, observing that neither did the decedent's children give anything to him or to the partnership at the time he contributed his assets nor did he sell the transferred property to the entity. Id. In Estate of Schauerhamer v. Commissioner, supra, the contributed assets were included in the decedent's gross estate under section 2036(a) without discussion of the exception, leading to the inference that it would not apply in such circumstances.

We further are convinced that the cases cited by the estate do not require a contrary conclusion. The estate points in particular to Estate of Jones v. Commissioner, 116 T.C. 121 (2001); Estate of Strangi v. Commissioner, 115 T.C. 478 (2000); Shepherd v. Commissioner, 115 T.C. 376 (2000), affd. 283 F.3d 1258 (11th Cir. 2002); Estate of Harrison v. Commissioner, T.C.

Memo. 1987-8; and Church v. United States, 85 AFTR 2d 2000-804, 2000-1 USTC par. 60,369 (W.D. Tex. 2000), affd. without published opinion 268 F.3d 1063 (5th Cir. 2001).  The estate apparently argues that the just-cited cases establish that a proportionate partnership interest constitutes per se adequate and full consideration for contributed assets.  We believe, however, that any such global formulation would overreach what can be drawn from the decisions.

First, with respect to Estate of Jones v. Commissioner, supra, Estate of Strangi v. Commissioner, supra, and Shepherd v. Commissioner, supra, none of these opinions involved section 2036.  Rather, they considered whether gifts were made at the inception of family limited partnership arrangements.  Estate of Jones v. Commissioner, supra at 127-128; Estate of Strangi v. Commissioner, supra at 489-490; Shepherd v. Commissioner, supra at 384-389.  The cases therefore do not control interpretation of the requirements of section 2036.  Furthermore, while section 2512(b) describes a gift as a transfer of property "for less than an adequate and full consideration in money or money's worth", there exists an equally fundamental principle that a gift requires a donee--some other individual must be enriched.  In this connection, we note that Estate of Jones v. Commissioner, supra at 127-128, and Estate of Strangi v. Commissioner, supra at 489-490, which find no gift at inception, say nothing explicit

about adequate and full consideration but do refer to enhancement, or lack thereof, of other partners' interests. Hence, even if relevant here, we would be unable to conclude that these rulings resolve the question of whether a proportionate entity interest, in and of itself, constitutes adequate and full consideration for contributed assets.

Second, although Estate of Harrison v. Commissioner, supra, and Church v. United States, supra, do address section 2036, there exist significant differences between these cases, on the one hand, and Estate of Reichardt v. Commissioner, supra, and Estate of Schauerhamer v. Commissioner, supra, on the other, which distinguish the two groups. In both Estate of Harrison v. Commissioner, supra, and Church v. United States, supra, the other partners made contributions at the formation of the entity which were not de minimis in nature. The partnership entity thus served as the vehicle for a genuine pooling of interests. The court in each case then went on to conclude that the partnerships had been created for a business purpose. Estate of Harrison v. Commissioner, supra; Church v. United States, supra.

Accordingly, it is not unreasonable to assume that a genuine pooling for business purposes injects something different into the adequate and full consideration calculus than does mere, unilateral value "recycling" as seen in Estate of Reichardt v. Commissioner, supra, Estate of Schauerhamer v. Commissioner,

supra, and the present matter.  In the former situation, there is at least the potential that intangibles stemming from a pooling for joint enterprise might support a ruling of adequate and full consideration.  We also note that section 25.2512-8, Gift Tax Regs., specifies that transfers "made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth."

We therefore hold that where a transaction involves only the genre of value "recycling" described above and does not appear to be motivated primarily by legitimate business concerns, no transfer for consideration within the meaning of section 2036(a) has taken place.  Hence, the exception provided in that statute is inapplicable.  Furthermore, although section 2043 can entitle taxpayers to an offset for partial consideration in cases where a transfer is otherwise subject to section 2036, this section, too, is inapplicable where, as here, there has been only a recycling of value and not a transfer for consideration.

### E.  Conclusion

We conclude that the property contributed by decedent to HFLP is included in his gross estate pursuant to section 2036(a).  We further note that, given the foregoing conclusion, we need not reach respondent's additional argument for includability, which argument is premised on disregard of the partnership for lack of

economic substance, a judicial doctrine.  Likewise, we need not address respondent's contentions with respect to gift tax liability, as those determinations were made in the alternative to full inclusion based on either section 2036(a) or the economic substance doctrine.  Accordingly, we now turn to valuation of the assets to be included in the gross estate.

IV.  Valuation

A.  Introduction and General Rules

Given our resolution above, the valuation inquiry with which we are concerned is the value on February 1, 1995, decedent's date of death, of the property previously transferred by decedent to the partnership.  In other words, we must ascertain the value of HFLP's underlying portfolio assets, without regard to any claimed discounts attributable to the partnership form.

As used in transfer tax statutes, value denotes fair market value, meaning "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  Sec. 20.2031-1(b), Estate Tax Regs.  Both parties submitted expert reports in support of their contentions regarding the fair market value of all property held by the partnership, referred to as HFLP's net asset value.  Clint

Cronkite, CA, ASA, prepared reports on behalf of the estate,[1] and John A. Thomson, ASA, MAI, prepared reports on behalf of respondent. We evaluate expert testimony in light of all evidence contained in the record and may accept or reject the proffered opinions, in whole or in part, according to our own judgement. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Shepherd v. Commissioner, 115 T.C. at 390. In particular, "'The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.'" Shepherd v. Commissioner, supra at 390 (quoting Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998)).

The respective appraisals by Mr. Cronkite and Mr. Thomson of HFLP's net asset value are summarized below:

| ASSET | Mr. Cronkite | Mr. Thomson |
|---|---|---|
| Cash | $2,517 | $2,517 |
| Marketable Securities (M.L. Stern & Co. Account) | 832,299 | 832,299 |
| California Tax-Free Income Fund (M.L. Stern & Co. Account) | 63,817 | 63,817 |
| Franklin AGE High Income Fund | 69,130 | 69,130 |
| Franklin California Tax-Free Fund | 249,979 | 249,979 |
| Putnam American Government Income Fund | 71,017 | 71,017 |

---

[1] The report submitted on behalf of the estate valuing HFLP as of February 1, 1995, contains a certification signed by both Mr. Cronkite and Helena Nam Reich, ASA. However, because it is Mr. Cronkite who testified at trial, whom both parties refer to as petitioner's expert, and whose qualifications have been stipulated by the parties, we adopt a similar convention of referring solely to Mr. Cronkite.

| | | |
|---|---|---|
| Rockefeller Center Properties, Inc. - Common | 14,375 | 14,375 |
| Note Receivable (Marsh note) | 300,000 | 405,000 |
| NET ASSET VALUE | $1,603,134 | $1,708,134 |

As can be seen from the foregoing table, the only difference reflected in the net asset value analyses of the parties' experts lies in their valuation of the Marsh note.[2]  This level of agreement is logical in light of the fact that the remaining assets, in addition to cash, consisted of marketable securities and mutual funds.  Before proceeding to address the Marsh note specifically, however, we deal with a question that has arisen concerning burden of proof.

B.  Burden of Proof

The estate's opening brief contains the statement that "the only matter as to which Petitioner bore the burden of proof was the determination of fair market value."  Respondent's opening brief refers to the estate's failing to satisfy its burden but also includes the following remark:  "Even if respondent had the burden with respect to the valuation of the property, the evidence produced by respondent clearly satisfies any such burden.  See Estate of Mitchell v. Commissioner, 250 F.3d 696

---

[2] Although one of the summary tables contained in Mr. Thomson's report states a value of $69,310 for the Franklin AGE High Income Fund, the $69,130 figure is used elsewhere in the report and is necessary to derive the oft-repeated total of $1,708,134.  We conclude that the $69,310 amount should be disregarded as a transcription error.

(9th Cir. 2001) [affg. in part and vacating and remanding in part T.C. Memo. 1997-461]." The estate's reply brief then focuses on the foregoing citation to Estate of Mitchell v. Commissioner, supra, in arguing that respondent does in fact bear the burden of proof in this situation.

The Court of Appeals for the Ninth Circuit, to which appeal in this case would normally lie, has addressed the issue of burden of proof in valuation cases in a series of three recent decisions. Estate of Mitchell v. Commissioner, supra; Estate of Simplot v. Commissioner, 249 F.3d 1191 (9th Cir. 2001), revg. and remanding 112 T.C. 130 (1999); Morrissey v. Commissioner, 243 F.3d 1145 (9th Cir. 2001), revg. and remanding Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. In each of these cases, the Commissioner determined an estate tax deficiency based upon an increase in the fair market value, over that claimed on the tax return, of shares in a closely held corporation. Estate of Mitchell v. Commissioner, supra at 698-699; Estate of Simplot v. Commissioner, supra at 1193; Morrissey v. Commissioner, supra at 1147. Subsequently, the Commissioner submitted for trial expert reports opining, and/or the Commissioner conceded, that the value of the subject stock was less than that asserted in the statutory notice. Estate of Mitchell v. Commissioner, supra at 702; Estate of Simplot v. Commissioner, supra at 1193-1194; Morrissey v. Commissioner, supra at 1147. Confronting this scenario, the

Court of Appeals in each instance indicated that the deviation in the Commissioner's litigation posture from the valuation stated in the notice resulted in a forfeiture of any presumption of correctness and/or a placing of the burden of proof on the Commissioner.  Estate of Mitchell v. Commissioner, supra at 702; Estate of Simplot v. Commissioner, supra at 1193; Morrissey v. Commissioner, supra at 1148-1149.

Under the rule of Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), this Court will "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals". We also acknowledge that the notice of deficiency issued with respect to decedent's estate tax placed a value of $1,750,000 on decedent's interest in the assets held by HFLP, while the expert report and posttrial briefs submitted by respondent advocate a value of $1,708,134.  Nonetheless, the record in this case is such that our conclusion would be the same regardless of any presumption of correctness or the falling of the burden of proof. We therefore need not further probe the implications here of the above-described decisions by the Court of Appeals for the Ninth Circuit and shall base our ruling on the preponderance of the evidence.

C.  Value of Marsh Note

The subject note, with principal amount of $450,000, was issued on April 15, 1991.  Jack P. Marsh was the maker, and the Trust was the payee.  The original due date was April 14, 1992, and the original interest rate borne by the note was 10.75 percent.  As of decedent's date of death, the note had been renewed annually for 1-year extensions, the interest rate had been reduced to 10 percent, and payments of interest were current.

The Marsh note was secured by collateral in the form of a 45-percent interest in a $1 million note, which note in turn was secured by a deed of trust on Carson Harbor Village, a mobile home park.  Jack P. Marsh was the payee of the $1 million note and beneficiary of the deed of trust, and Carson Harbor Village, Ltd., was the payor and trustor.  Carson Harbor Village, Ltd., was a limited partnership of which Goldstein Properties, Inc., was the general partner.  James F. Goldstein, as president of Goldstein Properties, signed the $1 million note and related deed of trust on behalf of Carson Harbor Village, Ltd.

i.  Mr. Cronkite's Report

Mr. Cronkite, at the outset of his report, states the terms of the Marsh note and indicates that it is secured by a collateral interest in the aforementioned note secured by deed of trust.  He continues:  "In addition to this note, there is a

first trust deed in the amount of approximately $10-$11 million."
In estimating the fair market value of the Marsh note, Mr.
Cronkite utilized two approaches:  (1) An income approach,
discounting future interest income to present value at its
required yield; and (2) a market approach, discussing the loan
with Mr. Marsh, an alleged secondary loans expert.

With respect to the income approach, Mr. Cronkite explained
that the higher the inherent risk in an income stream, the higher
the required yield to be used in computing present value.  The
portion of his report concerning selection of the required yield
to be employed here reads:

> The appropriate yield for an investment in this
> note was estimated based on a review of the May 1, 1991
> Note Secured By Deed Of Trust, which stipulates that in
> the event of default, the unpaid amounts will bear
> interest at the Contract Rate plus 5% per annum.  We
> concluded that 15% was an appropriate yield on this
> basis.

This 15-percent rate is then used in conjunction with a present
value formula to produce a $300,000 fair market value for the
subject note.

The section of Mr. Cronkite's report addressing the market
approach references discussions with Mr. Marsh and then sets
forth the following:

> According to Mr. Marsh, the $1,000,000 loan was
> intended to be interim financing only.  Harbor Village
> intended to refinance its property, but encountered
> environmental issues.

Although the loan is current, Mr. Marsh estimates that he could only get $0.70 to $0.80 on the dollar for a 100% interest, and perhaps $0.60 to $0.70 for a 45% interest (due to liquidity factors).

Based on the above, we conclude that the fair market value of the Marsh note is $300,000 (approximately 65% of $450,000).

ii. Mr. Thomson's Report

Mr. Thomson in his report preceded valuation of the Marsh note with a discussion of certain factual assumptions underlying his analysis. The report refers to the $1 million note as equating to "more than 2 to 1 coverage" for the Marsh note and mentions personal guaranties by Mr. Marsh and Mr. Goldstein. Mr. Thomson also addresses several items relating to the security for the $1 million note; namely, the value of the mobile home park, the existence of any prior liens against the park, and possible environmental issues pertaining to the park.

Mr. Thomson appraised the 410-unit mobile home park and concluded that it "could command a price of $40,000 to $50,000 per unit or $16.0 to $20.0 million based on other mobile home park sales we are familiar with in Southern California." As regards potential prior liens, the report states:

We requested any other Trust Deeds (notes), if any, against the Carson Harbor Village Mobile Home Park which may have a senior position to the $1,000,000 Deed of Trust. However, we were not provided any data on this request from the taxpayor [sic]. We did obtain a property profile from Chicago Title which showed no recorded liens as of the appraisal date.

Concerning environmental issues, Mr. Thomson reviewed Park Environmental Corporation's environmental analysis dated June 10, 1994, and requested, but was not provided, sections of a remedial action plan dated January 26, 1995, outlining procedures for removal and disposal of waste material. Cleanup was ultimately assumed to require minimal cost in comparison to the overall property value, such that it would not significantly influence refinancing or sale.

In then determining whether the Marsh note should be valued at a discount to its face value, Mr. Thomson weighed five factors. These were: (1) The collateral securing the note; (2) the existence of guaranties relating to the note and its collateral; (3) the interest rate on the note; (4) previously granted extensions of the note's maturity date and the currency of payments; and (5) environmental concerns related to the collateral. Mr. Thomson concluded that, of the foregoing factors, the first three enumerated would tend to support no discount or a slight premium while the latter two would tend to support a discount.

More specifically, Mr. Thomson opined that the following facts would tend to decrease any applicable discount: (1) The Marsh note possessed good collateral coverage in that it was secured by a $1 million note, which in turn was secured by a deed of trust on a well-located mobile home park; and (2) the $450,000

note was personally guaranteed by Mr. Marsh and the $1 million note was personally guaranteed by Mr. Goldstein. Neither increasing nor decreasing any applicable discount was the fact that the interest rate, at 10 percent, was a reasonable 87 basis points over the conventional mortgage rate of 9.13 percent for the week ended January 27, 1995. Identified as tending to increase any applicable discount were facts indicating: (1) The note had been extended several times, such that there could be no assurance it would be paid in full at the upcoming maturity date without legal action, although all interest payments were current; and (2) there could be environmental concerns relative to a small section of the mobile home property, which could delay the refinancing and/or sale of the property.

After setting forth the above factors, Mr. Thomson's report concludes:

> In our opinion, based on our experience with real property and promissory notes, we believe a range of 5 to 15 percent discount would be applicable to the subject $450,000 note. Therefore, based on the factors considered and the note itself, it is our opinion that a discount of 10.0 percent is reasonable to apply to the $450,000 note in HFCL.P., as of February 1, 1995. Accordingly, we have estimated the fair market value of the $450,000 note in HFCL.P. at $405,000, or ($450,000 x (1.0-.10)).

iii.  Analysis

In our comparison of the foregoing views, we generally found those of Mr. Thomson to be better explained, better supported, and more convincing.  While we conclude that certain factual assumptions described in Mr. Thomson's report were not established by a preponderance of the evidence, the level of detail in the report's treatment of individual factors considered enabled us to make adjustments within what was a reasonable framework.  In contrast, Mr. Cronkite's report was highly conclusory and revealed little about the underlying analysis.  As a result, we could neither perform any meaningful evaluation nor ascertain that the conclusions were supported by an appropriate foundation.  We therefore found Mr. Cronkite's report unpersuasive and of minimal assistance in the valuation endeavor.  Accordingly, we sustain respondent's position to the extent of the reduced valuation amount discussed below for the Marsh note.

Mr. Cronkite's Approaches:  We begin by addressing the difficulties encountered with Mr. Cronkite's approaches.  As previously mentioned, Mr. Cronkite included in his report an income approach discounting interest income at 15 percent.  Although the report explains that the required yield should reflect inherent risk in the income stream, it fails to offer any satisfactory link between this premise and the chosen 15-percent rate.  Mr. Cronkite apparently added the 5-percent default

increase specified in the $1 million note to the 10-percent contract rate of the $450,000 note.[3]  Why the default provisions negotiated with a different debtor nearly 4 years earlier accurately reflect the inherent risk in the Marsh note as of decedent's date of death is not elucidated.  We are afforded no information on relative conditions and circumstances that would facilitate a useful comparison.  It is for these reasons that we were unable to give Mr. Cronkite's income approach any significant weight in our analysis.  In addition, we observe that Mr. Cronkite testified at trial to having relied primarily on the market approach in his valuation.

As regards Mr. Cronkite's market approach, our concerns in many respects parallel those highlighted above in connection with the income approach.  Again, the report is cursory, conclusory, and reveals little underlying reasoning that would enable us to evaluate the result reached.  The report sets forth value estimates made by Mr. Marsh and characterizes Mr. Marsh as "a secondary loans expert".  Mr. Cronkite explained at trial only that Mr. Marsh "represented to me that he was an expert in the secondary loan market."  When questioned regarding Mr. Marsh's

_____

[3] Although the estate on brief refers to 15 percent as "the default rate under the Marsh Note" and respondent similarly characterizes 15 percent as "the default rate on the note", the copy of the Marsh note itself in the record does not contain any provisions regarding a default rate.  Rather, the $1 million note, which bears a contract rate of 11.25 percent, specifies a default rate of the contract rate plus 5 percent.

role in the valuation, Mr. Cronkite testified: "I relied primarily on an expert in the field to establish what the fair market value of the note was. I did some checking on that for reasonableness, determined that his analysis was reasonable." Mr. Cronkite also answered in the affirmative to an inquiry asking: "So, then, you essentially took your value of the note from Mr. Marsh, or based a good part of your conclusions on Mr. Marsh's own opinion?"

We, however, know almost nothing about the qualifications of Mr. Marsh beyond the fact that he was involved in lending the $1 million to Carson Harbor Village, Ltd., and was payee of the note for that amount and beneficiary of the related deed of trust. We are equally uninformed about the nature of the discussions that led to his appraisal. To wit, we are unaware of whether the figures were merely an offhand estimate or followed a period for study or evaluation. Mr. Marsh did not appear or testify at trial. Accordingly, we are asked to accept his opinions, as reported by Mr. Cronkite, without any opportunity to probe their foundation or any assurances that he was qualified to render them. We also note that his independence for purposes of offering a neutral opinion is not free from doubt. Furthermore, although Mr. Cronkite stated that he checked Mr. Marsh's analysis for reasonableness, he gave no indication whatsoever of the

materials or information that figured in such corroboration.  His

assertions therefore can do little to increase our confidence.

Another difficulty we have with the valuation produced by

Mr. Cronkite's market approach is the lack of explanation

concerning the factors taken into account in arriving at the

discount.  Environmental issues are mentioned, and Mr. Cronkite

testified that this factor was very important to Mr. Marsh.  When

asked what studies he reviewed in making a conclusion as to the

environmental problem, Mr. Cronkite responded:

> You know, I don't--I don't recall actual studies.
> I believe I had a lot of correspondence regarding the
> environmental issues.  My discussion with Mr. Marsh--he
> was certainly well aware of them.  The fact that they
> couldn't get, you know, refinancing due to the
> environmental concerns was an issue, but my
> understanding was, there was no dollar amount, you
> know, put on this, this liability.

These remarks, and the reference to environmental issues in

the report, fall short not only of assuring us that Mr. Cronkite

had a reliable foundation for his understanding of the

seriousness of the environmental problem but also of permitting

us to assess the role it played relative to any other factors.

We therefore are unable to accept portions of the analysis while

making adjustments in other aspects that we might find

unsupported by the evidence.  Nor can we usefully compare

components as between the two experts.  We are placed in a

position of having largely to embrace or reject Mr. Cronkite's

conclusions in wholesale fashion.  As a consequence, Mr. Cronkite's market approach, too, offers only a modicum of guidance in valuing the subject note.

Mr. Thomson's Approach:  We now address Mr. Thomson's approach, which weighed five factors in arriving at a 10-percent discount for the Marsh note.  We deal with each of these components seriatim, beginning with the factor addressing collateral coverage.  Mr. Thomson opined that collateral coverage on the Marsh note was good and cited both the $1 million note secured by deed of trust and the underlying mobile home park in support of this assertion.  The estate raises several points in response to Mr. Thomson's position on coverage, one of which involves the existence of a senior lien on the mobile home park.

As previously mentioned, Mr. Cronkite's report references a first trust deed in the amount of $10 to $11 million; Mr. Cronkite testified at trial that this statement was based on his discussion with Mr. Marsh and that he had seen no documents related to the encumbrance.

We pause here to note that the estate attempted at trial to introduce public records from the Los Angeles County Recorder's Office relating to the alleged first lien.  Respondent's objection to these documents was sustained on the grounds that the information was requested from the estate during discovery, was not provided, and should have been stipulated and/or

exchanged prior to trial in accordance with Rule 91 and this Court's Standing Pre-Trial Order. Presumably Mr. Thomson was unaware of these documents when formulating his expert opinion, since he makes no mention of them. The Court deemed the consequent surprise significant in these circumstances. The estate then sought by requests and motions filed after trial to have judicial notice taken of the documents. Such submissions were denied as an improper attempt to augment the closed record without the concurrence of the opposing party.

Mr. Thomson relied on a property profile from Chicago Title showing no prior liens, but this document has not been made a part of the record. The record also leaves unclear the extent to which the property profile would have contained historical data reflecting encumbrances as of February 1, 1995. As a result, we are not satisfied that either expert relied on adequate information in developing his opinion.

However, even if we were to hypothesize the existence of a first lien, we do not believe that Mr. Thomson's more general reliance in valuing the Marsh note on good collateral coverage would be appreciably weakened. Because Mr. Thomson appraised the mobile home park at $16 to $20 million, generous coverage would not cease to exist merely on account of a first trust deed in the $10- to $11-million range.

Furthermore, the record contains no materials that undermine the value placed by Mr. Thomson on the park, prior to consideration of environmental issues, or offer an alternative figure. Mr. Cronkite did not inspect the mobile home park or perform a real estate appraisal, and his professional qualifications do not reveal any expertise in the real estate area. Mr. Thomson, on the other hand, is a licensed real estate appraiser and broker in the State of California. He testified to having appraised mobile home parks. We thus are confident that he would have been in a position to make an informed judgment about a general value range in comparison to other Southern California mobile home park sales. In addition, the fact that the park was refinanced in 1997, after the year in issue, for nearly $16 million also lends a degree of credence to Mr. Thomson's numbers.

Another point raised by the estate concerns references in Mr. Thomson's report to the coverage provided by the primary collateral, the $1 million note, as "more than 2 to 1". Although the actual coverage is only "1 to 1", inasmuch as the Marsh note was secured by a 45-percent interest in the $1 million note, we again do not believe that this fact, in and of itself, eviscerates the basic premise of good coverage. We are equally unconvinced that any of the various other contentions made by the estate on brief render unreasonable the conclusion that the Marsh

note was well covered by collateral.  Hence, while we acknowledge
that the level of coverage was not as great as Mr. Thomson may
have assumed, we remain satisfied that good coverage could
appropriately be considered as a positive factor enhancing the
value of the subject note.

We next address the factor involving personal guaranties,
about which the parties express significant differences.  Mr.
Cronkite indicated at trial that he was not aware of any personal
guaranties at the time he prepared his report, while Mr. Thomson
took guaranties into account in his valuation.  The record
contains no guaranty agreement or document relating to either the
Marsh note or the $1 million note, and the notes themselves bear
no evidence of a guarantor.  Instead, guaranties are referred to
in several items of correspondence which passed between Mr. Marsh
and either decedent or Michael.  The first is an April 15, 1991,
letter from Mr. Marsh to decedent.  This letter adverts to the
new $450,000 promissory note and concludes with the following
paragraph:

> I am proceeding with the closing of the
> $1,000,000.00 loan to James Goldstein that will be
> adequately secured by a Note secured by Deed of Trust
> on real property.  I, of course, will have all the
> necessary personal guarantees, etc. on same.  If, for
> any reason whatsoever, this loan does not close within
> the next fifteen days, your funds will be returned to
> you upon demand plus 10 3/4% interest from April 15,
> 1991.  If the loan closes, Morton B. Harper, Trustee of
> the Morton B. Harper Revocable Trust Dated December 18,
> 1990, will be assigned, as collateral, a 45% interest

in the $1,000,000.00 Note.  Your investment will also be personally guaranteed by myself along with the personal guarantee of James Goldstein.

Then, in a second letter from Mr. Marsh to decedent, dated June 6, 1991, Mr. Marsh enumerates five enclosed documents.  The first four pertain to the $1 million note and deed of trust.  The fifth item is "Personal Guarantee dated May 1, 1991, executed by Jack P. Marsh."

Later, an August 15, 1994, letter from Michael to Mr. Marsh advised that the Trust's interest in the Marsh note had been assigned to the partnership and asks Mr. Marsh to acknowledge his agreement that "all preexisting assignments of the collateral Note and Deed of Trust security and also your Guarantee dated May 1, 1991 remain in full force and effect for the benefit of" HFLP.  The August 28, 1994, letter agreement between Mr. Marsh and the Trust then similarly declares that security for the $450,000 investment funds is assigned to the partnership and that "Jack P. Marsh's personal guarantee for the $450,000.00 investment funds is still in effect and is transferred to" HFLP.

Lastly, a February 10, 1995, letter from Mr. Marsh to Michael states that the "$450,000.00 Note is personally guaranteed by Jack P. Marsh" and that the "$1,000,000.00 Carson Harbor Village, Ltd. Note is personally guaranteed by James Goldstein."

In assessing the import of this documentary evidence, we must also be conscious of relevant provisions of State law.  Cal. Civ. Code sec. 2787 (West 1993) defines "guarantor" for purpose of the statutes relating to rights and obligations which arise out of a guaranty relationship:

> The distinction between sureties and guarantors is hereby abolished.  The terms and their derivatives, wherever used in this code or in any other statute or law of this State now in force or hereafter enacted, shall have the same meaning, hereinafter in this section defined.  A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor. * * *

Against the foregoing backdrop, we first consider the existence of any guaranty by Mr. Marsh.  Clearly, Mr. Marsh and the Harpers were under the impression that Mr. Marsh had executed a personal guaranty on May 1, 1991.  However, to the extent that the purported guaranty existed and was of the $450,000 note, we conclude that it should be disregarded in the valuation process. The $450,000 note on its face is an unrestricted personal obligation of "Jack P. Marsh".  Accordingly, any personal guaranty thereof would fail to conform to the definition of a guaranty under California law, would be no more than a redundant second promise to pay personally, and would not appreciably enhance the value of the note.  Furthermore, to the extent that the context provided by certain of the above letters could support an inference that Mr. Marsh's alleged May 1, 1991,

guaranty was actually of the $1 million note, the evidence is ambiguous and fails to establish such a guaranty by a preponderance.

Concerning a possible guaranty of the $1 million note by Mr. Goldstein, we again find the record insufficient to meet respondent's burden. While the April 15, 1991, letter indicates prospectively that Mr. Marsh intended to seek a guaranty from Mr. Goldstein, the absence of any reference to a Goldstein guaranty in the June 6, 1991, letter is conspicuous. The June 6, 1991, letter specifically enumerates documents pertaining to the $1 million note, as well as a personal guaranty by Mr. Marsh. The omission of any mention of a guaranty by Mr. Goldstein could certainly imply that the anticipated assurance was not obtained. The only other item which alludes to a Goldstein guaranty is the February 10, 1995, letter written nearly 4 years later. Given this record, we are not convinced that the latter document sufficiently overcomes the inference which can be drawn from the more contemporaneous letters. In summary then, we conclude that, on the evidence before us, personal guaranties should not be considered as a factor enhancing the value of the Marsh note.

As regards the factor directed toward the interest rate on the note, Mr. Thomson found this element to be neutral. Mr. Thomson compared the 9.13-percent conventional mortgage rate for the week ended January 27, 1995, as reported in the Federal

Reserve Statistical Release, to the 10-percent rate born by the Marsh note.  He concluded that the spread of 87 basis points was reasonable.  Mr. Cronkite indicated that he did not research interest rates, the estate has offered no alternative evidence or position, and we have no grounds for doubt of Mr. Thomson's assumptions on this matter.

Turning to the two factors that Mr. Thomson felt would increase any applicable discount, we begin with that pertaining to maturity date and extensions.  Mr. Thomson indicated that, given the repeated annual extensions of maturity, there existed a lack of assurance that the note would be paid in full at its upcoming due date.  He viewed this circumstance as one which would favor an increase in discount.  Again, the estate has not challenged the foregoing premise, and we note Mr. Cronkite testified with similar import.  Mr. Cronkite stated:  "whether there's a pending maturity date, I think is kind of moot.  I believe everyone thought it wouldn't--it wouldn't be paid at the maturity date."   We find Mr. Thomson's analysis of maturity issues to be logical.

The remaining factor identified by Mr. Thomson as tending to support an increased discount focuses on environmental concerns. Both parties and their experts are in agreement insofar as the notion that environmental issues relating to the mobile home park detract from the value of the Marsh note.  The estate, however,

places a far greater emphasis on this factor and alleges that Mr. Thomson trivialized the seriousness of the Carson Harbor Village property's environmental condition. Mr. Cronkite, as we have previously discussed, offered generalized testimony portraying the environmental issues as very important to Mr. Marsh but conceded that he had not reviewed any environmental studies in preparing his report. He also cited the fact that refinancing for the property was not obtained until 1997 as an indication of the seriousness of the problem.

Mr. Thomson reviewed an analysis by Park Environmental Corporation and requested, but was not provided, portions of a study by McLaren/Hart addressing remedial action. Mr. Thomson testified that in reading the materials obtained he did not perceive any groundwater contamination but did see mentioned a surface tarlike substance which seemed to be confined to a relatively small, 20- to 30-foot area of the property. Mr. Thomson described his assessment of this information: "Well, as an investor wanting to buy that note, I would be concerned about the environmental, and that did--that's what really generated our discount. I would be concerned. I didn't think it was a big impact, but it was an impact that was--could delay the

refinancing." In a similar vein, his report assumes a comparatively minimal cleanup cost but does recognize the factor as a contingency detracting from the value of the note.

On this record, we believe that Mr. Thomson has taken the better supported and more convincing position on environmental issues. He reviewed objective materials and was able to offer specifics relating to the physical condition of the property. Mr. Cronkite relied almost exclusively on the generalized opinion of Mr. Marsh. While we understand that Mr. Marsh was the beneficiary of the $1 million note secured by the park, we are uninformed as to the nature, extent, or basis of his knowledge regarding the park's environmental profile. Additionally, although both sides acknowledge a delay in refinancing that could have been attributable to environmental problems, we saw before us no evidence confirming the degree to which environmental concerns figured in financing negotiations. We therefore conclude that Mr. Thomson appropriately took environmental issues into account as one of several factors affecting value and was not compelled to give greater emphasis to this feature.

The foregoing evaluation thus results in a scenario comprising one factor tending to decrease and two tending to increase any applicable discount, with the other two factors being either neutral or irrelevant. Mr. Thomson used these five factors to place the discount for the Marsh note within a 5- to

15-percent range.  With two positive and two negative elements, Mr. Thompson appears to have selected the midpoint of the range, or 10 percent.

As to the range itself, Mr. Thomson's report states that the numbers are "based on our experience with real property and promissory notes".  When asked at trial whether he was aware of any note transactions or published compilations of note transactions to use as comparables, Mr. Thomson responded: "Specific transactions?  As a California real estate broker, I get information all the time.  I'm not specifically aware of any source that necessarily tracks--are you saying trust deeds? * * * [Counsel replies affirmatively.]  I get brokers sending me stuff all the time, but I don't have anything specific to track them." Mr. Thomson also indicated that he could conceive of situations where discounts would be 33 percent or greater, as where a note was unsecured or bore a below-market interest rate.

Mr. Cronkite's report states:  "Mr. Marsh estimates that he could only get $0.70 to $0.80 on the dollar for a 100% interest, and perhaps $0.60 to $0.70 for a 45% interest (due to liquidity factors)."  These remarks would seem to refer to discount ranges for interests in the $1 million note.  Mr. Cronkite thus apparently selected a discount for the Marsh note based on what Mr. Marsh "estimate[d]" he could "perhaps" get for sales of the $1 million note.  Yet Mr. Cronkite at trial neither expounded

upon the basis for Mr. Marsh's ranges nor provided any exegesis for his derivation therefrom of a 33.33-percent discount for the Marsh note.

Faced with this limited record, we observe that both sides' treatments of discount ranges leave something to be desired in terms of support and explanation. Nonetheless, we again are satisfied that Mr. Thomson has submitted the more convincing position. We know that he is a licensed real estate broker and appraiser, and his testimony tied the selected range to data regularly received from professionals in the real estate brokerage field. In contrast, we reiterate that Mr. Marsh's alleged expertise in this area is not established by the record. We additionally repeat our concern about the complete absence of information as to the underpinnings for his views. We therefore accept Mr. Thomson's 5- to 15-percent range.

Within the above-stated range, however, we seek a discount reflective of one factor tending to decrease and two tending to increase the applicable figure, rather than an even split of factors. Accordingly, we conclude that 12 percent, or two-thirds of the spread from 5 to 15 percent (rounded), is an appropriate discount. The fair market value of the Marsh note is thus held

to be $396,000 ($450,000 x (1-.12)).  This results in a total value for the HFLP assets to be included in decedent's gross estate under section 2036 of $1,699,134.

To reflect the foregoing,

Decision will be entered under Rule 155.